718 F.2d 1389
 14 Ed. Law Rep. 40
 AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, et al.,
Plaintiffs- Appellees,
v.
The SCHOOL DISTRICT OF the CITY OF GRAND RAPIDS (82-1600),
Defendant-Appellant,
Irma Garcia-Aguilar, et al., (82-1601),
Intervenor-Defendants-Appellants,
Phillip Runkel, et al., (82-1602), Defendants-Appellants.
 Nos. 82-1600 to 82-1602.
 United States Court of Appeals,
Sixth Circuit.
 Argued Jan. 26, 1983.
Decided Sept. 23, 1983.
Certiorari Granted Feb. 27, 1984.
See 104 S.Ct. 1412.
 
 Stuart D. Hubbell (argued), Traverse City, Mich., for defendant-appellant in No. 82-1601, & plaintiffs-appellees in Nos. 82-1600 and 82-1602.
 Albert R. Dilley (argued), Grand Rapids, Mich., for plaintiffs-appellees in all cases.
 William S. Farr, John R. Oostema, Grand Rapids, Mich., for plaintiffs-appellees in Nos. 82-1601 and 82-1602, for defendant-appellant in No. 82-1600.
 Gerald F. Young, Asst. Atty. Gen., Lansing, Mich., for plaintiffs-appellees in Nos. 82-1600 and 82-1601, for defendant-appellant in No. 82-1602.
 Frank J. Kelley, Lansing, Mich., for defendant-appellant in No. 82-1602.
 Before EDWARDS, Chief Judge, and LIVELY and KRUPANSKY, Circuit Judges.
 GEORGE CLIFTON EDWARDS, Jr., Chief Judge.
 
 INTRODUCTION
 
 1
 The First Amendment to the Constitution of the United States provides in its first clause: "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof, ..." The United States Supreme Court has established that this amendment applies with full force to the various states of the union. Committee for Public Education and Religious Liberty v. Regan, 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980); Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947); Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).
 
 
 2
 At the outset, this court recognizes that the State of Michigan, through its legislature and courts, has approved the expenditure of public funds for the purposes described in the statement of facts below. See In Re Proposal C (Traverse City School District v. Attorney General), 384 Mich. 390, 185 N.W.2d 9 (1971); Citizens to Advance Public Education v. State Superintendent of Public Instruction, 65 Mich.App. 168, 237 N.W.2d 232 (1975), leave to appeal denied, 397 Mich. 854 (1976); 1976 MICH.PUB.ACT 451, Sec. 331; 1979 MICH.PUB.ACT 94, Sec. 1; MICH.COMP.LAWS ANN. Sec. 380.331 (1976 & Supp.1983); MICH.COMP.LAWS ANN. Sec. 388.1601 (1979 & Supp.1983); MICH.STAT.ANN. Sec. 15.1919(901) (1976 & Supp.1983); MICH.STAT.ANN. Sec. 315.4331 (1979). On complaint, however, it is the responsibility of the federal courts (ultimately, of course, of the Supreme Court of the United States) to determine whether specific tax supported benefits provided by state law violate the establishment clause of the Constitution of the United States.
 
 THE NATURE OF THIS CASE
 
 3
 This is a taxpayers' suit filed by various citizens of the City of Grand Rapids contending that a Shared Time and Community Education program operated by the School District of the City of Grand Rapids in school buildings owned and operated by various religious denominations in Grand Rapids is an unconstitutional "establishment" of religion and its method of operation requires an unconstitutional entanglement of public and religious affairs. The case was heard before District Judge Benjamin Gibson in Grand Rapids, Michigan, in an eight-day trial. After Judge Gibson recused himself, the case was transferred to District Judge Richard Enslen who, by agreement of the parties, decided the case on the basis of transcript testimony and other written documentary evidence which had been submitted to Judge Gibson, 546 F.Supp. 1071.
 
 
 4
 Judge Enslen dismissed plaintiff Americans United for Separation of Church and State and returned judgment in favor of the individual plaintiffs. A stay application was then filed by appellant before the District Judge. He denied the request. On appeal, this Circuit by majority vote affirmed the denial. A stay application was then filed with Circuit Justice Sandra Day O'Connor and likewise was denied.
 
 
 5
 On this appeal the following parts of the program are at issue before this court: 1) Shared Time classes at the elementary level, 2) Community Education classes at the elementary level, and 3) one remedial math Shared Time class at the secondary level. All classes concerned in this case were held in classrooms in parochial schools.
 
 
 6
 Judge Enslen held that the individual plaintiffs have standing to attack these programs under the establishment clause. We agree with his reasoning and result on this issue. See Flast v. Cohen, 392 U.S. 83, 103-06, 88 S.Ct. 1942, 1954-1955, 20 L.Ed.2d 947 (1968); McCollum v. Bd. of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948); Everson v. Bd. of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947). He also concluded that public tax support for these programs in the parochial schools, in spite of measures taken to eliminate within the specific classrooms both religious teaching and religious symbolism, had an impermissible effect of advancing the various religions involved and resulted in excessive entanglement of government and religion.
 
 STATEMENT OF FACTS
 
 7
 After full briefing and appellate hearing, we have now reviewed the lengthy record and the briefs filed by the respective parties and find that Judge Enslen's statement of facts should be adopted by this court. It follows:
 
 
 8
 Although the parties, as expected, propose differing interpretations of the facts and urge opposing views of the legal consequences which flow therefrom, the Court, after careful consideration of the entire record, believes that the salient facts underlying this litigation are largely undisputed. The basic facts are set forth below; more detailed facts will be elaborated within that section of the Opinion to which they pertain.
 
 
 9
 At the outset it should be noted that, throughout this proceeding, the term "shared time" has been used to describe both the Shared Time and the Community Education programs. Individually and collectively both programs have enjoyed a steady growth since their inception. For the 1978-79 school year, there were 9,494 nonpublic school students enrolled in the combined programs; the payment of state school aid funds attributable to those students totalled $1,397,577.20. By the 1981-82 school year, the programs had been extended across county lines, the number of participating nonpublic school students exceeded 11,000, and state aid approached $6,000,000. Besides being offered through the Defendant School District, both programs contain additional common characteristics which will be discussed immediately below. Thereafter, because Shared Time and Community Education are individual and distinct educational programs, they will be discussed separately.
 
 
 10
 In both the Shared Time and Community Education programs, Defendant School District utilizes a standard form lease to gain access to nonpublic school classrooms and other facilities. The lease specifies a rental charge of $6 per class per week at the elementary schools, and $10 per class per week at the secondary schools. In none of the leases is there any mention of the particular room, space or facility which the instrument governs, and they do not, by their terms, restrict public school employees or students from occupying or using any facility within the nonpublic schools. Indeed, teachers' rooms, libraries, lavatories and similar facilities used in connection with the let premises are generally made available to the School District.
 
 
 11
 No crucifixes, religious symbols or artifacts may be displayed in leased facilities. Before any nonpublic school facility may be utilized by either of the public school programs, it is necessary to "desanctify" the facility to ensure that no such symbols are exhibited. In many instances, religious symbols or artifacts, or both, exist in adjoining corridors, surrounding rooms, or other facilities used in connection with the leasehold.
 
 
 12
 The School District requires its instructors to post signs within the class area designating it as a public school classroom. At least one instructor testified that she carried the "public school" sign with her as she moved throughout the nonpublic schools. There are no signs posted outside of the nonpublic schools indicating that public school courses are being offered therein, or that the facilities serve as a public school annex.
 
 
 13
 Almost without exception, those students attending Shared Time and Community Education courses in facilities leased from a nonpublic school are the very same students who attend that particular nonpublic school during the regular school day. Thus, there is a virtual identity between students receiving Shared Time or Community Education instruction at any given nonpublic school and the students regularly attending that nonpublic school.
 
 
 14
 Shared Time and Community Education instruction involves 470 full and part-time teachers. Every Shared Time instructor is employed in accordance with the ordinary hiring procedures adopted by the School District for the City of Grand Rapids. A significant portion of the Shared Time instructors previously taught in nonpublic schools, and many of those had been assigned to the same nonpublic school where they were previously employed. The majority of Community Education offerings on facilities leased from a nonpublic school are taught by instructors employed full time by the very same nonpublic school.
 
 
 15
 Shared Time is a program wherein the school district offers substantive courses from its general curriculum to nonpublic school students during regular school hours. As noted in Traverse City School District v. Attorney General, supra, [384 Mich.] at 407, n. 2 [185 N.W.2d 9], such shared time classes have been offered in various Michigan school districts for more than 60 years. In their original form, shared time courses provided public school instruction for nonpublic school pupils at public school sites in subjects widely regarded as being secular. Typical shared time course offerings included mathematics, reading, physical education and art. Perhaps the most striking difference between the Shared Time program at issue, and the prototypical program is that the instant arrangement is conducted entirely within the participating nonpublic schools in facilities leased by the School District. This Grand Rapids variation on the shared time arrangement was initiated in 1976, following a Michigan Court of Appeals decision upholding the constitutionality of shared time instruction on leased premises under conditions of public school control. Citizens to Advance Public Education v. State Superintendent of Public Instruction, supra.
 
 
 16
 During the 1981-82 academic year, forty-one private schools participated in the Grand Rapids Shared Time program. With the exception of physical education, industrial arts, music and art, the educational opportunities offered through the program are, in the main, supplementary to the core curriculum of the nonpublic schools. The basic Shared Time course titles include: Art, Music, Physical Education, Industrial Arts, Educational Park, Remedial and Enrichment Mathematics, and Remedial and Enrichment Reading. Various other courses have been offered through Shared Time instruction; they include the following: Humanities, Language Arts, Home Economics, Science, Spanish, French, Latin, Business, Social Studies, Yearbook, Calculus, Creative Writing, Psychology, Journalism, Criminology, and Advanced Biology. The specific courses available through the elementary level Shared Time programs would not otherwise be available in any of the nonpublic schools, and are not required for graduation or progression to the next grade. The participating private secondary schools, however, require for graduation a course in physical education. Such courses are offered at these schools only on a Shared Time basis.
 
 
 17
 Notwithstanding the numerous Shared Time courses, the amount of time in which the average nonpublic school student receives such instruction is a relatively small portion of that student's total educational experience. There was testimony that ten percent of any given nonpublic school student's time during the academic year would consist of Shared Time instruction. Typically, a nonpublic school student does not participate in every Shared Time course offered at his school.
 
 
 18
 In the early 1970's, the School District of the City of Grand Rapids instituted the Community Education program in the Grand Rapids Public Schools. Beginning in approximately 1975, that program, which offers to students a diverse array of educational and other enrichment opportunities, was, offered for the first time, at facilities leased from those nonpublic schools which elected to participate. Whenever offered, Community Education courses are taught by Grand Rapids public school employees under the supervision and control of the public schools. Classes offered at nonpublic school sites are now, and have always been, conducted in facilities leased from the participating private institutions.
 
 
 19
 Unlike Shared Time, the Community Education offerings at issue are scheduled outside of regular school hours. Participating schools, especially those at the elementary level, host "after school" or "leisure time" Community Education courses which, as the name implies, commence at the conclusion of the regular school day. Additionally, at the participating nonpublic high schools, Community Education courses are offered immediately preceding the regular school day, during the "zero hour." Many such "zero hour" classes offer substantive rather than enrichment courses; indeed, certain of the secondary level Community Education courses may be taken for credit toward graduation. "Zero hour" courses include: Typing, Business Machines, Computer Programming, Photography, Retailing, Communications, Bookkeeping and Astronomy.
 
 
 20
 Community Education instruction is completely voluntary and will be offered only in the event that twelve or more students are enrolled. Because of this rule of twelve, a well known teacher able to attract students is essential to the establishment of a successful Community Education program. For that reason, and with respect to Community Education only, the School District accords a preference in hiring to instructors already established with students in the building where the nonpublic course will be offered. Currently, there are over 300 Community Education instructors employed on a part-time basis by the School District of the City of Grand Rapids. The majority of those part-time Community Education instructors are employed full time by the situs school, whether public or private. As a consequence, virtually every Community Education course conducted on facilities leased from nonpublic schools has an instructor otherwise employed full time by the same nonpublic school.
 
 
 21
 Of the nonpublic schools presently participating in the community Education program, none have ever provided an identical course to their students. In that respect, Community Education courses do not represent substitutes for courses formerly offered at nonpublic schools. Although certain Community Education courses offered at nonpublic school sites are not offered at the public schools on a Community Education basis, all Community Education programs are otherwise available at the public schools, usually as a part of their more extensive regular curriculum.
 
 
 22
 Finally, because a participating nonpublic school's calendar is not necessarily coterminous with that of the public school's, the Defendant School District has attempted to accommodate the nonpublic schools. For example, it rearranges schedules during religious holidays not recognized by the public schools. At the elementary level, Community Education courses span a twelve week term of shorter duration than the regular nonpublic school semester. At the secondary level, all Community Education programs generally follow the public school calendar.
 
 The Nonpublic Schools
 
 23
 Approximately forty of the Grand Rapids area nonpublic schools which have elected to participate in the Shared Time and Community Education programs are, by their own admission, "religiously oriented." The challenged programs have, at one time or another, been offered in facilities rented from 28 Roman Catholic schools, 7 Christian schools, 3 Lutheran schools, 1 Seventh Day Adventist school and 1 Baptist school. For purposes of general discussion, most of those schools can be readily divided on the basis of religious affiliation into three categories, to wit: Roman Catholic, Christian, and Lutheran. Plaintiffs introduced abundant evidence tending to demonstrate that a substantial portion of the function of the participating nonpublic schools' "functions are subsumed in the religious mission..." Hunt v. McNair, 413 U.S. 734, 743, 93 S.Ct. 2868 [2874], 37 L.Ed.2d 923 (1973).
 
 A. The Catholic Schools
 
 24
 The elementary and secondary Roman Catholic schools participating in the challenged programs provide their 6,233 students with an opportunity to receive religious instruction. Sister Marie Heyda, author of the book Catholic Central and West Catholic High Schools, candidly testified, that the following sentence in her book states the philosophy of education in Catholic schools:
 
 
 25
 Certainly religion and the values of the spiritual life must always be an integral part of the atmosphere of the Catholic high school for in the modern age they are the only reason for its being. Id. at p. 80. (Emphasis supplied).
 
 
 26
 The St. Jude School Parent Handbook, contains this typical statement of the philosophy of Catholic education:
 
 
 27
 A God oriented environment which permeates the total educational program.
 
 
 28
 * * *
 
 
 29
 * * *
 
 
 30
 Opportunities to pray, worship and celebrate as members of a Christian community.
 
 
 31
 A Christian atmosphere which guides and encourages participation in the church's commitment to social justice.
 
 
 32
 A continuous development of knowledge of the Catholic faith, its traditions, teachings and theology. (Emphasis supplied).
 
 
 33
 Each of the Catholic schools is governed by its own Board of Education, normally composed of the pastor and lay members, elected by constituents of the parish with which the school is associated. Although there is no such requirement, nearly all Board members are adherents of the Roman Catholic religion.
 
 
 34
 Typically, on a daily basis the Catholic schools include some form of prayer or religious observance; on a weekly basis they include actual attendance at religious services. Moreover, the affidavit of Ronald J. Cook, Superintendent of Schools for the Roman Catholic Diocese of Grand Rapids, states at paragraph 21 that: "... It is the policy of the Grand Rapids Catholic schools ordinarily to require students to attend religious instruction classes and religious services either at the Catholic school or at the church of his own faith if the student is not Catholic." No less than 85 percent of the students and 90 percent of the instructors at the combined schools are Catholic.
 
 B. The Christian Schools
 
 35
 Each of the five elementary and one secondary Christian school is operated by the Grand Rapids Christian School Association, an association composed of parents and others who support Christian education. Membership in the Association is restricted to those who subscribe to a doctrinal Basis. The Basis, which is contained within the Association's Bylaws, provides:
 
 
 36
 Section 1.3 Basis. The supreme standard of the Association shall be the scriptures of the Old and New Testament, herein confessed to the the [sic] infallible Word of God, as these are interpreted in the historic Reformed confessions: The Belgic Confession; Heidelberg Catechism, and Canons of Dort.
 
 
 37
 Acknowledging that that [sic] these Scriptures, in instructing us of God, ourselves, and God's creation, contain basic principles authoritative and relevant for education, we hold that:
 
 
 38
 (a) The authority and responsibility for education (sic) children resides in the parents or guardians of the children and not in the state or the church. Parents, however, may delegate their authority to those who can competently carry out this God-given parental right.
 
 
 39
 (b) The primary aim of a Christian parent is (sic) securing the education of his child should be to give him a Christian education--that is, an education whose goal is to equip the child for living the Christian life as a member of the Christian community in contemporary society.
 
 
 40
 (c) Christian parents, when delegating the authority for educating their children, should delegate it to those institutions which seek to provide Christian education for the student.
 
 
 41
 (d) The responsibility for maintaining such institutions rests on the entire Christian community.
 
 
 42
 (e) The Christ proclaimed in the infallible Scriptures is the Redeemer and Renewer of our entire life, thus also of our teaching and learning. Consequently in a school which seeks to provide a Christian education it is not sufficient that the teachings of Christianity be a separate subject in the curriculum, but the Word of God must be an all-pervading force in the educational program. (Emphasis Supplied).
 
 
 43
 The Association elects a Board of twelve trustees to operate the schools and make policy decisions. Currently, all twelve trustees are members of the Christian Reformed Church. Article VI of the Bylaws grant to the trustees authority with respect to educational policy:
 
 
 44
 Section 6.1 Educational Authority. The Board of Trustees of the Association shall have general and plenary authority, oower [sic] and responsibility with respect to the educational policies in its schools, including, without limitation, the following:
 
 
 45
 (a) To determine and establish the curricula and courses of study to be taught in its schools;
 
 
 46
 (b) To establish grades and departments in its schools;
 
 
 47
 (c) To hire and contract with principals, teachers, librarians and other faculity [sic] and staff, and assign such persons to tis [sic] schools;
 
 
 48
 (d) To specify, purchase and furnish books and other educational materials, supplies and equipment;
 
 
 49
 * * *
 
 
 50
 * * *
 
 
 51
 (g) To establish policies for interschool functions and relationships;
 
 
 52
 (h) To develop, establish and carry into effect plans for the development of Christian education in those areas which are or may be served by the Association.
 
 
 53
 (i) To make rules and regulations relating in any way to the administrative and educational policies to be followed in its schools.
 
 
 54
 The evidence established that for the past three school years 88 percent of the students of the Grand Rapids Christian School Association belonged to the Christian Reformed Church or the Reformed Church in America. An informational brochure distributed by Creston-Mayfield Christian School, a member of the Grand Rapids Christian School Association, relates that: "Christian parents who express their commitment to Christian education are welcome to enroll their children. They will be accepted without regard to race, color, national or ethnic origin." The brochure's conspicuous omission of any reference to "religion" is not inadvertent. Indeed, the application form for admission to the Christian School Association requires the parent to either subscribe to the Basis or to agree to have his children taught according to the Basis principles.
 
 
 55
 The Seymour Christian School Staff Handbook, at section seven, discusses the attributes of a Christian teacher as follows:
 
 A CHRISTIAN TEACHER
 
 56
 1. A Christian teacher is first of all a servant of his Lord and Savior. His concepts of God, man, and the world find their authority in the Bible. His doctrinal stance requires that he interpret his subject matter from a Christian point of view. His emotional maturity, intellectual competency, and spiritual vibrancy is obvious. His task is to teach God's children about God's world in the light in God's word.
 
 
 57
 * * *
 
 
 58
 * * *
 
 
 59
 3. The Christian teacher sees his students as image bearers of God who will be active in His Kingdom now and forever. He will use every means available to give his students this perspective. He will be a living example of Christian behavior. He will conspicuously teach Christian virtues. He will promote a Christian sense of values in his classroom by teaching respect for authority, respect for the property of others, desire to cooperate, enthusiasm for work, concern for others, and most importantly, submission to the Lordship of Christ. The teacher will be sensitive to his student's academic and spiritual needs. (Emphasis supplied.)
 
 
 60
 The majority of instructors employed by the Grand Rapids Christian School Association are members of the Christian Reformed Church.
 
 C. The Lutheran School
 
 61
 The only Lutheran school presently participating in the Shared Time and Community Education programs is Immanuel-St. James Lutheran School. The educational philosophy of that institution is perhaps best expressed in the "Credo on Christian Education" contained within the Immanuel-St. James Lutheran School Handbook:
 
 
 62
 IMMANUAL-ST. JAMES CREDO ON CHRISTIAN EDUCATION
 
 
 63
 WE BELIEVE that Christian education is a vital aspect of the Church's mission, commanded by God through the Great Commission.
 
 
 64
 WE BELIEVE that Christian education is directed toward the total development of people, providing for their spiritual, intellectual, emotional, social and physical needs.
 
 
 65
 WE BELIEVE that Christian education is a responsibility of all believers toward all people.
 
 
 66
 WE BELIEVE that the purpose for Christian education is to teach the Christian faith through
 
 
 67
 (a) instruction in God's word
 
 
 68
 (b) living in relationships of love and forgiveness.
 
 
 69
 WE BELIEVE that an effective program of Christian education is based on a distinct theology and determines its curriculum by taking into account current world conditions.
 
 
 70
 WE BELIEVE that effective education is achieved as quality learning programs relate the Christian faith in every aspect of life.
 
 
 71
 WE BELIEVE that the family exerts much influence on a child's total education, and that the church must equip adults for their important role in Christian education.
 
 
 72
 This philosophy is reaffirmed in a section titled: "The Goals of Education", contained in the same booklet which states, in part, that the goals of Lutheran education involve:
 
 
 73
 1. Leading the child to faith in the Lord Jesus Christ, and keeping him/her in that faith to eternal life in heaven.
 
 
 74
 2. Helping the child in Christian growth in all relationships of life, such as the family, the Church, the State, the relationship of friendship, of employment and labor, of art and culture.
 
 
 75
 Immanuel-St. James Lutheran School is a joint effort of the members of Immanuel and St. James Lutheran congregations. The Voters Assemblies of each of these congregations has established a joint Board of Education to direct and conduct the affairs of the school. This joint Board of Education consists of members elected from each participating congregation.
 
 
 76
 Immanuel-St. James Lutheran School is housed in two separate buildings, located on a site which adjoins a Lutheran church. Prayer and religious instruction are part of the daily curriculum at the school. In addition to the daily formal study of the Lutheran faith and daily devotions, the staff and the pupils assemble on a weekly basis, as well as on days of special religious import, for devotional services. Students in the school are expected to be present during religious instruction and services.
 
 
 77
 At page 6 of the Immanuel-St. James Lutheran School Handbook there appears a section captioned: "Distinctive Features of Immanuel-St. James Lutheran School", which reads:
 
 
 78
 1. GOD AND HIS WORD ARE CENTRAL.
 
 
 79
 The Holy Bible influences all lessons and activities in our Christian Day School. Through Scripture the Holy Spirit works to increase the child's understanding of himself, his purpose, his destiny, and his Lord.2. THE CHILD RECEIVES THROUGH, (sic) SYSTEMATIC INSTRUCTION IN THE TEACHING OF CHRISTIANITY.
 
 
 80
 Christian teachers lead the child in daily study of God's word and in prayer and worship. Particular attention is given to clarifying the story of sin and salvation. In addition, the pupil is trained to practice his Christianity. Guided by teachers and fellow pupils, he grows in Christian knowledge, attitude and conduct.
 
 
 81
 3. THE CHILD RECEIVES A THOROUGH TRAINING IN THE COMMON SCHOOL SUBJECTS.
 
 
 82
 The child is instructed in all the common school branches of learning, as prescribed by the state. But all such instruction is given from a Christian point of view. The child is thus protected from the dangers of a purely secular schooling.
 
 
 83
 4. THE CHILD LIVES IN A CHRISTIAN ENVIRONMENT.
 
 
 84
 The devil constantly seeks to undermine the Christian's faith. The importance of school environment, therefore, is not to be under estimated. True, misunderstandings and incidents of misbehavior and conflict will occur in this school also. But the power of sin is lessened when Christian teachers and children live in intimate relation with their Lord, and in loving concern for one another's growth in holy living.
 
 
 85
 5. THE CHILD GROWS INTO HIS CHURCH.
 
 
 86
 More and more active workers in the local congregation and in the church at large are needed. Leaders, pastors, teachers, and lay persons--must be developed to guide the church's work. Members who remain faithful to the Lord, and who are wise stewards of their time, abilities, and possessions, are essential. Immanuel-St. James Lutheran School trains children for just such roles.
 
 
 87
 With respect to the admission policy, Kraig Johnson, the principal of Immanuel-St. James, candidly admitted that preference is given to members of the Lutheran faith. In that regard, paragraph 7 of the official admissions policy for the school states:
 
 
 88
 7. Members of the sponsoring congregations are given first opportunity to enroll their children. Children of non-member families are accepted on the following basis and availability of space:
 
 
 89
 a) children from sister congregations;
 
 
 90
 b) children from other Lutheran churches;
 
 
 91
 c) children from other Christian schools;
 
 
 92
 d) and others who desire a Christian education.
 
 
 93
 The effect of that admissions policy on the enrollment of Immanuel-St. James is substantial. Currently, by Mr. Johnson's own estimate, approximately six-sevenths of the students enrollment are Lutheran. Moreover, instructors keep attendance records on church and Sunday school attendance, and perfect church and Sunday school attendance awards are given at the end of each school year.
 
 
 94
 An individual interested in obtaining a teaching position at Immanuel-St. James Lutheran School must meet stringent requirements. Those are stated concisely at page 8 of the Immanuel-St. James Lutheran School Handbook:
 
 
 95
 The teachers of Immanuel-St. James Lutheran School meet all the requirements of Synod for its parochial school teachers and the requirements of the State of Michigan, Department of Education. The teachers have pledged themselves to use every opportunity for continued spiritual and professional growth. They are personally interested in the complete welfare of each individual child. Our teachers have always been known to give unselfishly of their time to students and parents who have special needs.
 
 
 96
 The District Judge measured the impact of this program upon constitutional concerns under the basic three-fold test set forth in Chief Justice Burger's opinion for the Court in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).
 
 
 97
 Every analysis in this area must begin with consideration of the cumulative criteria developed by the Court over many years. Three such tests may be gleaned from our cases. First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, Board of Education v. Allen, 392 U.S. 236, 243 [88 S.Ct. 1923, 1926, 20 L.Ed.2d 1060] (1968); finally, the statute must not foster "an excessive government entanglement with religion." Walz [v. Tax Commission ] supra [397 U.S. 664], at 674 [90 S.Ct. 1409, at 1414, 25 L.Ed.2d 697].
 
 
 98
 403 U.S. at 612-13, 91 S.Ct. at 2111.
 
 
 99
 Dealing with the secular purpose aspect of the crucial tests, Judge Enslen held: "The purpose of the Shared Time and Community Education programs are manifestly secular. Inquiry into the purposes of the School District in establishing the programs, and the Michigan legislature in authorizing the necessary funds, provides no basis to form a conclusion that there was any purpose or intent to advance religion unconstitutionally."
 
 
 100
 Our review of this record convinces us that these conclusions are not "clearly erroneous" and we affirm.
 
 
 101
 As to the second test, the District Judge arrived at a different conclusion. That test is stated as whether the legislation attacked is one which "neither advances nor inhibits religion ..." On this issue the District Judge first reviewed arguably applicable Supreme Court case law: Meek v. Pittenger, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); Sloan v. Lemon, 413 U.S. 825, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973); Commissioner of Public Education & Religious Liberty v. Nyquist, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968); Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947).
 
 The District Judge then held:
 
 102
 In assessing the instant matter, I observe that the Shared Time and Community Education programs have a number of relevant characteristics in common with the "dual-enrollment" program, which was permanently enjoined by this Court in Americans United for Separation of Church and State v. Porter, supra. In each of the programs, a lease was the instrument through which the public school district gained access to nonpublic school facilities. One effect, in both cases, permitted nonpublic school students to attend public school classes without ever leaving the nonpublic school or mixing with public school students. A second common feature is the complete identity of the student body in the "public school" classes and the nonpublic schools. As in Porter, all of the students in Shared Time and Community Education classes are full-time students of the nonpublic schools. Since there are, in fact, no public school students participating in the instant programs, the nonpublic schools are permitted to retain their private religious character. Certainly, there are other similarities and differences between the two programs. However, these two features are significant in that they demonstrate that each of the programs has a constitutionally impermissible effect. Accord, Americans United For Separation of Church and State v. Oakey, 337 F.Supp. 545 (D.Vt.1972); Americans United For Separation of Church and State v. Paire, 359 F.Supp. 505 (D.N.H.1973); Fisher v. Clackamas County School District, 13 Or.App. 56, 507 P.2d 839 (1973); Americans United for Separation of Church and State v. Beechwood Independent School District, 369 F.Supp. 1059 (E.D.Ky.1974).
 
 
 103
 In assessing whether the Shared Time program has a sufficiently secular effect, the Court must determine, among other things, whether the class benefited is sufficiently broad. Even when genuinely motivated by an undeniably secular purpose, government must not act so as to support a narrow group of religiously segregated beneficiaries. The challenged programs impact upon a very narrow religious class of beneficiaries. The narrowness of the benefited class was a crucial factor in Nyquist in striking down the tax relief program for parents of nonpublic school children where parochial school children composed over 80 percent of the benefited class. Conversely, the breadth of this class has also been a determinative factor in sustaining aid to nonpublic school pupils, particularly at the university level. Wolman v. Walter [433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714], supra. The Grand Rapids program, by distinction, directly benefits nonpublic school students, and hence nonpublic schools, while at the same time it excludes members of the public at large. Whereas public school students are assembled at the public facility nearest to their residence, students in religious schools are assembled on the basis of religion without any consideration of residence or school district boundaries. With respect to the exclusion of public from Shared Time classes, a mere statement in the lease that such programs are open to all, does not, as the evidence plainly demonstrated, make the program open to the public.
 
 
 104
 Despite Defendants' assertions to the contrary, the Court finds that beneficiaries are wholly designated on the basis of religion and, as will be discussed more fully below, the programs as currently implemented also carry with them the destructive potential for political divisiveness. Many of the Shared Time instructors previously taught at the same nonpublic school to which they have now been assigned as public employees. In the Community Education program, the vast majority of instructors are also employed full time by the same nonpublic school. Without questioning the good faith and integrity of the teachers, this Court cannot ignore the potential for advancing religious doctrine under these conditions. Notwithstanding these concerns, a larger problem lies in the fact that challenged courses are conducted in the sectarian atmosphere of the religious schools. As specifically addressed in Nyquist, there is a deeper concern that the atmosphere of the schools, rather than actions of the instructors, will have an effect which advances religion. When courses are offered within the abdomen of a sectarian institution to students who are brought together for a religious mission, there is a distinctly impermissible constitutional effect.
 
 
 105
 Another glaring nonsecular effect of the programs is that financial responsibility for teaching Physical Education, Art, Music and all of the other available course offerings has been transferred from the private religious schools to the taxpayers. By entering into a legalistic agreement with the parochial schools, the public schools have gained more than access to facilities. They have conferred substantial financial benefits upon those religious institutions by employing and paying from tax funds the numerous instructors who teach subjects in the leased classrooms. Without any change in the character of the student body or infusion of any students from other schools, the programs have undeniably rendered direct benefits, both financial and otherwise, to the sectarian institutions. Such an effect is clearly irreconcilable with the dictates of the Establishment Clause.
 
 
 106
 The relative merit and benefits of the Shared Time and Community Education programs are not issues before the Court. The issue here is whether this composition of students and teachers, when combined in the sectarian atmosphere of a religious school, fosters an impermissible effect under the Establishment Clause. For the reasons discussed herein, I hold that the challenged programs do violate the First Amendment.
 
 
 107
 Because we think the second Lemon test, "advances or inhibits religion," and the third, "excessive entanglement of government with religion," are impossible completely to separate in the context of this case, we shall reserve our analysis and decision until we have the District Judge's response to both before us.
 
 
 108
 As to whether the currently disputed Grand Rapids School Board program represents an excessive entanglement of government with religion, the District Judge held as follows:
 
 The Entanglement Problems
 
 109
 Created out of a desire to minimize government intrusion into the realm of religion, the third aspect of the constitutional standard requires that the program under scrutiny must avoid "an excessive government entanglement with religion." Walz v. Tax Commissioner, supra, [397 U.S.] at 674 [90 S.Ct. at 1414]. Generally, excessiveness is a question of degree and is often referred to as "administrative entanglement." Some governmental activity that does not have an impermissible religious effect may nevertheless be unconstitutional, if in order to avoid the religious effect government must enter into an arrangement which requires it to monitor the activity. Lemon v. Kurtzman, supra; Levitt v. Committee for Public Education, supra.
 
 
 110
 An additional and somewhat different form of entanglement, "political entanglement", was first enunciated in Lemon v. Kurtzman, supra:
 
 
 111
 A broader base of entanglement of yet a different character is presented by the divisive political potential of these state programs. In a community where such a large number of pupils are served by church-related schools, it can be assumed that state assistance will entail considerable political activity. Partisans of parochial schools, understandably concerned with rising costs and sincerely dedicated to both the religious and secular educational missions of their schools, will inevitably champion this cause and promote political action to achieve their goals. Those who oppose state aid, whether for constitutional, religious, or fiscal reasons, will inevitably respond and employ all of the usual political campaign techniques to prevail. Candidates will be forced to declare and voters to choose. It would be unrealistic to ignore the fact that many people confronted with issues of this kind will find their votes aligned with their faith.
 
 
 112
 Ordinarily political debate and division, however vigorous or even partisan, are normal and healthy manifestations of our democratic system of government, but political division along religious lines was one of the principal evils against which the First Amendment was to protect. 403 U.S. at 622 [91 S.Ct. at 2115-2116]. (Emphasis supplied).
 
 
 113
 I have already decided that the educational programs at issue benefit narrow groups of citizens on the basis of religion. Because Grand Rapids is a religiously pluralistic community, there are already religious divisions in that city. In preparation for the March, 1980, school millage campaign, the Grand Rapids Board of Education published Citizens Handbook Millage 80, which was distributed as a factual source book to campaign workers. In that booklet the Board of Education has made a purposeful effort to influence favorably the taxpayers sending children to nonpublic schools on the basis of benefits conferred under the programs challenged herein. In attempting to align voters with its cause, the School Board has unquestionably fostered political division along religious lines in disregard of the warnings in Lemon. The next Grand Rapids school millage election is scheduled for 1983. Obviously the potential for political division on the issue of financial aid to religious schools appears imminent. Lemon clearly addresses the problem confronting the parties here:
 
 
 114
 The potential for political divisiveness related to religious beliefs and practice is aggravated in these two statutory programs by the need for continuing annual appropriations and the likelihood of larger and larger demands as costs and populations grow. The Rhode Island District Court found that the parochial school system's 'monumental and deepening financial crisis' would 'inescapably' require larger annual appropriations subsidizing greater percentages of the salaries of lay teachers. Although no facts have been developed in this respect in the Pennsylvania case, it appears that such pressures for expanding aid have already required the state legislature to include a portion of the state revenues from cigarette taxes in the program. 403 U.S. at 623-624 [91 S.Ct. at 2116]. (Emphasis supplied).
 
 
 115
 One can scarcely criticize the Defendant School District. Given the realities of the national and state economies (not to mention the curious Michigan formula for financially supporting its public schools), extra voted millage is the only way a school district can keep its school doors open. Obviously, appealing to the voters and importuning them to favorably consider a new millage proposal requires the District to utilize all the persuasion, and all the public relations hyperbole, that it possesses. It is sensible, then, for the district to appeal to those voters who have opted to send their children to private schools. While sensible, it also is a political appeal to the voting community. As such, it invites opposition, as do all political propositions.
 
 
 116
 In oral argument counsel for Defendant School District urged this Court to consider the fact that, although a potential for political divisiveness might exist, such a division had not occurred. Such an argument ignores the existence of the instant suit and the affidavits of four of the Plaintiffs. Other divisiveness occasioned by the Citizens Handbook is only surmise, and such speculation lies without the purview of this Court. Within the ambit of my decision however, is the inescapable conclusion that such political appeal, as contained in the handbook, creates the potential for political division. Such a tendency has long been constitutionally disfavored.
 
 
 117
 Indeed, the potential for political divisiveness is altogether too evident. The School District "campaigned" (a political ingredient as ancient as politics itself) for a successful millage in 1980, and included the appeal to the nonpublic school parents. Some candidates for the school board advertised their approval for the millage, including approval of the inclusion of the Shared Time and Community Education programs. This is not a potential for political division but rather historical fact. Voters may also disagree on the issue of the "profitability" of the suspect program. Similarly, the spectre of Board candidates dividing voters over the program haunts the political process.
 
 
 118
 The potential problems include the 1983 millage election and whether the Board will again appeal to nonpublic school parents. Should one of the Plaintiffs be a school board candidate, that potential becomes a reality.
 
 
 119
 Defendants further argue that I should ignore the potential for political divisiveness notwithstanding Lemon, Roemer, and Nyquist, because in the instant case the programs have existed for some time without such division. In summary, they argue that potential can be ignored when the track is smooth. Such an argument applies only to effect, however, and not to the clear teaching of Lemon and its progeny with respect to potential. Indeed, it might be argued that political interference with religion, and its corollary, was the touchstone of the drafters' reasoning in the First Amendment.
 
 
 120
 Periodic appropriations battles and expanded budgetary demands heighten the threat of political divisiveness resulting from the programs at issue. Therefore, I conclude that both programs create an untenable potential for political division along sectarian lines. While "the prospect of such divisiveness may not alone warrant the invalidation of state laws that otherwise survive the careful scrutiny required by the decision of the Court, it is certainly a 'warning signal' not to be ignored." Committee for Public Education v. Nyquist, supra, [413 U.S.] at 794 [93 S.Ct. at 2976].
 
 
 121
 By contrast, forbidden administrative entanglement normally takes the form of excessive government surveillance of religious institutions and personnel. This type of administrative entanglement typically involves the government in policing the expenditures of public monies to insure, as the Establishment Clause requires, that such monies are expended only for secular purposes. An evaluation of administrative entanglement requires me to consider three factors: "(1) the character and purposes of the benefited institutions, (2) the nature of the aid provided, and (3) the resulting relationship between the state and the religious authority." Roemer v. Maryland Public Works Board, 426 U.S. at 748 [96 S.Ct. 2337, at 2346, 49 L.Ed.2d 179].
 
 
 122
 As to the character and purpose of the benefited institutions, I have previously concluded that the aided schools, both elementary and secondary, are characterized by substantial religious activity having the primary purpose of advancing religious doctrines. Most, if not all, of the nonpublic schools were located on or near parish churches. The great majority of instructors at those schools are members of the religious faith with which the school is affiliated. This is also true for the great majority of students, all of whom are at an impressionable age. I conclude without hesitation that the purpose of these schools is to advance their particular religions.
 
 
 123
 Having previously discussed at length the nature of the aid provided, the Court now examines resulting relationship between the state and the religious institutions. The Grand Rapids Public Schools utilized a lease to gain access to facilities within the religious schools participating in the Shared Time and Community Education programs. The director of the Shared Time program testified that he contacts the nonpublic schools that participate in the program to determine which classrooms can be leased. Subsequently, the director visits the nonpublic school building to confer with the Shared Time instructor as to whether the facilities provided are suitable. Pursuant to this arrangement, during the 1981-82 school year rental payments in excess of $200,000 were received by participating nonpublic schools.
 
 
 124
 I have previously addressed the virtual identity of the student body and the teaching staff. The record also discloses that no evidence was offered by Defendants that any of the participating students come from public schools. As a matter of fact, one witness admitted that a public school student would not be permitted to enroll in a Shared Time class even though that program was "public". Though Defendants claim the Shared Time program is available to all students, the record is abundantly clear that only nonpublic school students wearing the cloak of a "public school student" can enroll in it.
 
 
 125
 Sharp focus on administrative entanglement reveals that there is considerable duplication between the teachers and staff of the Shared Time program and the nonpublic schools at which their services are rendered. The evidence abundantly demonstrates that many teachers who are employed by a nonpublic school are also employed by the Grand Rapids Public Schools in the Community Education program at the same school. In other instances teachers, now working as Shared Time instructors were previously employed by the nonpublic school at the same buildings. Teachers working in the sectarian schools, where religion is an integral part of its very purpose, are bound to the advancement of that purpose. As employees of the Grand Rapids Public Schools, those same teachers must discard any expression of the religious values that are otherwise part of the nonpublic schools' reason for existence. Moreover, they must do this within the same building where the normal curriculum is offered, including religion. In essence, nonpublic school teachers employed on a part-time basis by the Grand Rapids Public Schools are required to reverse roles during different times of the day.
 
 
 126
 The case of Kenneth Zandee is illustrative of the dilemma. Prior to 1977, Zandee was a full-time physical education teacher at Christian High School. In 1977, he entered the employ of the Grand Rapids Public Schools Shared Time program as a full-time physical education teacher assigned to teach at Christian High School. Zandee, thus, returned to Christian High School, this time as a public school employee paid from tax money, to teach the very same subject to the very same Christian High School students. Clearly, during this transition the Grand Rapids Public School had assumed the function of providing physical education courses to the students at Christian High School. To complicate matters further, Zandee also teaches a course called Body Mechanics in the "zero hour" Community Education program conducted at school. Finally, Zandee is also employed by Christian High School, as basketball coach, in both his and the school's private capacities.
 
 
 127
 The case of Mr. Zandee demonstrates the interrelationships which have of necessity developed between the government and the nonpublic institutions. Likewise, the case of Zandee, and others similarly situated, portrays the real need for monitoring to insure that religious views are not advanced in Shared Time or Community Education programs. Without such monitoring the programs run the risk of enhancing religious views. If the courses are monitored, the programs are still infirm in that an excessive administrative entanglement is necessitated. In either case, the same ultimate result applies and the programs cannot be sustained.
 
 
 128
 The Court's finding that the programs breed an excessive administrative entanglement is bolstered by the procedures through which classes and schedules are coordinated for the programs. In order to coordinate the scheduling of 1,500 classes offered by 470 teachers, the Grand Rapids Public Schools take the following steps: Shared Time and Community Education course packets are sent to the participating nonpublic schools. In turn, nonpublic schools reply, indicating which classes they wish to offer. The Director of the Shared Time program then contacts the nonpublic schools to determine which classrooms are available. He then confers with the Shared Time teachers to see if the rooms provided are satisfactory. Additionally, because the academic year calendars of the involved schools is not necessarily coterminous, certain adjustments must be made. One reason the calendars are different relates to religious holidays which the nonpublic schools celebrate. Adjusting schedules creates obvious additional administrative entanglement. Upon closer scrutiny the need to intrude becomes greater as does the assault on the First Amendment. Once entanglement becomes necessary, like a runaway horse, it is hard to corral.
 
 
 129
 Once the class schedules are set, still more forms of entanglement arise. For example, parents wishing to speak with a Shared Time instructor are encouraged to make an appointment through the nonpublic school's administrative office. It is noteworthy that a great number of the schools publish handbooks which commingle Shared Time and Community Education classes and instructors with those offered exclusively by the nonpublic school. No mention is made of the fact that these teachers are public school employees and the classes are public offerings. Instead, the impression is conveyed that the teachers listed are nonpublic school teachers. Likewise, the courses listed convey the impression that they are offerings of the particular nonpublic school. Additional entanglement problems arise with respect to student discipline, attendance and dress code policies.
 
 
 130
 The trial record reveals that, indeed, there has been intermingling of public and nonpublic personnel, courses and other materials. It is not unusual for the supervisor of one of the challenged programs to be a teacher, or even the principal, at one of the participating religious schools. Indeed, teachers now on the public school payroll occupy similar positions as before the inception of the programs, with minimal changes in the identity of students or responsibilities. The Public School District is gradually, but surely, taking over an integral function of these religious schools; namely, providing an education to parochial students. As they are currently implemented, it is not difficult to see that both programs are destined to continue expanding numerically, geographically and, most significantly, in terms of the attendant administrative entanglement. For the above reasons, I am compelled to hold that both the Shared Time and the Community Education programs at issue are constitutionally infirm on the basis that they create an excessive administrative entanglement between government and religion.DECISION
 
 
 131
 Detailed consideration of the trial record, of the findings and conclusions of the District Judge, and of the applicable Supreme Court case law generated by the First Amendment clause prohibiting any law "respecting an establishment of religion" convinces this court that the judgment of the District Court must be affirmed.
 
 
 132
 We accept, as did the District Judge, the facts upon which the appellants chiefly rely. There is no doubt that all of the parochial schools concerned (except the Lutheran School) accept applicants for admission from families of other religious persuasions and admit some such students. There is no proof that any teacher in either Shared Time or Community Development classes has sought in such classes to indoctrinate any student in accordance with the school's religious persuasion.
 
 
 133
 Nonetheless, several conclusions flow from the record, and findings of the District Court:
 
 
 134
 First, the schools with whom the School Board of Grand Rapids has contracted and in which these classes are taught are religious institutions created, controlled and operated (as, of course, they have a clear right to be) with the advancement of their various religious faiths as a primary purpose.
 
 
 135
 Second, the majority of the controlling boards, administrators and teachers in the schools are adherents to the particular school's religious mission, as are the great majority of the parents of the students and the students themselves.
 
 
 136
 Third, the program has increased to the point where it involves 10% of the classroom time of the schools concerned and a total tax expenditure of $6,000,000.
 
 
 137
 Fourth, a substantial number of the teachers employed in the Shared Time program were previously employed in the parochial school concerned, and a majority of teachers employed in the Community Education classes are teachers regularly employed in teaching in the religiously oriented program of the schools concerned.
 
 
 138
 Fifth, such supplementation of teachers' salaries is a direct benefit to all teachers in the two programs, and through them to the schools and to the religious mission of the schools concerned.
 
 
 139
 Sixth, the District Judge found, and we agree, that as to the three school systems concerned, "a substantial portion of the participating nonpublic schools' 'functions are subsumed in the religious mission ...' " Hunt v. McNair, 413 U.S. 734, 743, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973). This last finding is amply substantiated by the following materials which describe the religious nature of the programs with which we deal in this case. As to the Catholic schools, the Superintendent of Schools for the Roman Catholic Diocese of Grand Rapids stated by affidavit in this record, "It is the policy of the Grand Rapids Catholic schools ordinarily to require students to attend religious instruction classes and religious services either at the Catholic school or at the church of his own faith if the student is not Catholic." The St. Jude School Parent Handbook describes the philosophy of Catholic education as "A God oriented environment which permeates the total educational program." As to the Christian schools, the District Judge found that membership in the Grand Rapids Christian School Association, which operates the schools, is restricted to those who subscribe to a doctrinal Basis, which provides in part: "the Word of God must be an all-pervading force in the educational program." (See the full statement of Basis, supra, page 10.) As to the Lutheran school involved in the Shared Time and Community Development program, the School Handbook says in part: "The child is instructed in all the common school branches of learning, as prescribed by the state. But all such instruction is given from a Christian point of view. The child is thus protected from the dangers of a purely secular schooling."
 
 
 140
 The District Judge stated his conclusion in this case as follows:
 
 
 141
 The trial record reveals that, indeed, there has been intermingling of public and nonpublic personnel, courses and other materials. It is not unusual for the supervisor of one of the challenged programs to be a teacher, or even the principal, at one of the participating religious schools. Indeed, teachers now on the public school payroll occupy similar positions as before the inception of the programs, with minimal changes in the identity of students or responsibilities. The Public School District is gradually, but surely, taking over an integral function of these religious schools; namely, providing an education to parochial students. As they are currently implemented, it is not difficult to see that both programs are destined to continue expanding numerically, geographically and, most significantly, in terms of the attendant administrative entanglement. For the above reasons, I am compelled to hold that both the Shared Time and the Community Education programs at issue are constitutionally infirm on the basis that they create an excessive administrative entanglement between government and religion.
 
 
 142
 The Shared Time and Community Education programs established and implemented by the School District for the City of Grand Rapids, through the use of premises leased from various religious schools, violate the Establishment Clause of the United States Constitution because the programs have the primary effect of advancing religion, and because the programs involve an excessive government entanglement with religion. Plaintiffs are entitled to a Permanent injunction barring further implementation of the programs at issue and the expenditure of public tax monies.
 
 
 143
 Our review of Supreme Court First Amendment case law convinces us that we must affirm Judge Enslen's conclusion in this case as stated immediately above. The cases upon which we rely primarily for our conclusions are the following: Wolman v. Walter, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977); Meek v. Pittenger, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); Committee for Public Education v. Nyquist, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952); McCollum v. Bd. of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948).
 
 
 144
 The significant features which distinguish this present case from cases wherein the Supreme Court has not found violation of the establishment clause are these: First, this program is primarily a program of assistance to elementary schools;[1] second, this program is one which gives substantial financial aid to education in parochial school buildings;[2] third, the parochial schools concerned have religious indoctrination as a primary school purpose;[3] fourth, the impact upon taxpayers and the parochial schools is direct.[4]
 
 
 145
 We recognize that the Supreme Court has recently divided 5-4 in upholding a Minnesota tax statute which allowed taxpayers to deduct certain expenses paid by them as parents in connection with their children's attendance in either public or private schools. These expenses included deductions generally beneficial to parents of all school children such as books, supplies and transportation. The statute also allowed deduction up to $500 or $700 of tuition paid to private, including parochial, schools. This was, of course, a deduction not generally available to parents of children in public schools--a fact which led four Justices to dissent on the grounds that the tuition deduction "has a primary effect of promoting religion." The majority in upholding the Minnesota statute relied principally upon the fact that the statute made some deductions (for books, school supplies, transportation, etc.) generally available to parents of all school children. Justice Rehnquist, writing for the majority, also distinguished earlier Supreme Court decisions on the grounds that in the Minnesota tax case the aid was given to the parents of the children involved and not to the parochial schools themselves. The majority opinion said:
 
 
 146
 We also agree with the Court of Appeals that, by channeling whatever assistance it may provide to parochial schools through individual parents, Minnesota has reduced the Establishment Clause objections to which its action is subject. It is true, of course, that financial assistance provided to parents ultimately has an economic effect comparable to that of aid given directly to the schools attended by their children. It is also true, however, that under Minnesota's arrangement public funds become available only as a result of numerous, private choices of individual parents of school-age children. For these reasons, we recognized in Nyquist that the means by which state assistance flows to private schools is of some importance: we said that "the fact that aid is disbursed to parents rather than to--schools" is a material consideration in Establishment Clause analysis, albeit "only one among many to be considered." Nyquist [413 U.S.] at 781 [93 S.Ct. at 2970]. It is noteworthy that all but one of our recent cases invalidating state aid to parochial schools have involved the direct transmission of assistance from the state to the schools themselves. The exception, of course, was Nyquist, which, as discussed previously is distinguishable from this case on other grounds. Where, as here, aid to parochial schools is available only as a result of decisions of individual parents no "imprimatur of State approval," Widmar, at 274 [102 S.Ct., at 276], can be deemed to have been conferred on any particular religion, or on religion generally.
 
 
 147
 --- U.S. ----, 103 S.Ct. 3069 (1983).
 
 
 148
 The Shared Time and Community Development programs at issue in this case clearly give direct aid to parochial schools in parochial school buildings. By so doing, they also assist those schools in performing their religious missions, in violation of the First Amendment.
 
 
 149
 We recognize, of course, the increasing impact of Supreme Court majority approval of public funding for religiously neutral supplies and services which are provided to all schools, including parochial schools. If, however, what has been adopted by the Grand Rapids School Board were to be added to the list of such approvals, the separation of church and state will be effectively ended in the field of public education. Legislatures in many states are notoriously vulnerable to pressures from religious constituencies. Under such pressures legislatures can be expected to allocate increasing Shared Time or Community Development funds to the point where the great majority of parochial school costs will be carried by taxpayers. The only costs not covered may in time be those specifically allocated to religious services or classes in religious instruction. Constant secular inspection and surveillance of all activities not specifically labeled religious would be required to maintain even a fiction of separation. Such a result would end public education as a major aspect of the American goal of equality of opportunity.
 
 THE DISSENT
 
 150
 The dissent in this case cites a number of cases which illustrate that the Supreme Court of the United States has approved as not violative of the First Amendment's establishment clause many instances of tax-supported activities which in addition to serving nonsectarian public purposes, also render assistance to parochial school children. It cites no instance (because there is none) where the Supreme Court has approved expending public tax funds for teachers to teach in parochial schools.
 
 
 151
 In this regard, however, it also cites Wheeler v. Barrera, 417 U.S. 402, 94 S.Ct. 2274, 41 L.Ed.2d 159 (1974), seemingly as support for its position. The Wheeler case, however, is not authority for the position taken by the dissent. As Justice Powell put the matter in his concurrence with the majority:
 
 
 152
 MR. JUSTICE POWELL, concurring.
 
 
 153
 The Court holds that under Title I of the Elementary and Secondary Education Act of 1965, as amended, 20 U.S.C. Sec. 241a et seq., federal courts may not ignore state-law prohibitions against the use of publicly employed teachers in private schools, ante [417 U.S.], at 416-417 [94 S.Ct. at 2282-2283], that Title I does not mandate on-the-premises instruction in private schools, ante, at 419 [94 S.Ct. at 2284], and that Title I does not require that the services to be provided in private schools be identical in all respects to those offered in public schools. Ante, at 420-421 [94 S.Ct. at 2284-2285]. It is thus unnecessary to decide whether the assignment of publicly employed teachers to provide instruction in sectarian schools would contravene the Establishment Clause of the First Amendment. Ante, at 415 [94 S.Ct. at 2282]. On that basis, I join the Court's opinion. I would have serious misgivings about the constitutionality of a statute that required the utilization of public school teachers in sectarian schools. See Committee for Public Education v. Nyquist, 413 U.S. 756 [93 S.Ct. 2955, 37 L.Ed.2d 948] (1973).
 
 
 154
 Id. at 428, 94 S.Ct. at 2288-2289.
 
 
 155
 Similarly, the dissent seeks to make some association between the 60 years of operation of the Community Education program in the Grand Rapids public schools and the placement of teachers on the public payrolls in the three parochial systems involved in this litigation. The preceding Community Education program is not involved at all in this litigation--except as an example of how public funds may appropriately be used to teach parochial school children in public school classes in public schools.
 
 
 156
 This record clearly shows that the parochial school child who takes a publicly tax-supported class from a regular parochial school teacher who is on the public payroll for that class is likely to be taught by a teacher who is a member of the religious faith which operates the parochial school. As such he or she is charged with carrying out the religious mission of the church concerned. That teacher, without any breach of faith by either the religious denomination or the public schools, by his or her effective teaching in the Shared Time or Community Education class may so impress the student as to become a role model. That same teacher in the corridors outside that classroom door--in the lunchroom, on the playground, in the auditorium, or in another class when on the parochial school payroll--has an obligation to carry out his or her assigned role of religious education and indoctrination of this same student. Under these circumstances, the task of separating church and state becomes literally impossible, and the program has the primary effect of advancing religion.
 
 
 157
 Where for six years 470 teachers on tax-supported payrolls have been teaching 11,000 children in 41 private schools without significant monitoring, the relationships between those teachers and those students are bound to have had an effect in carrying out the parochial school teacher's duty to advance religion.
 
 
 158
 We should also point out that while the three churches involved at this time in this program have reputations for social responsibility, this same sort of program, if legitimatized by ultimate legal authority and spread nationwide, will face applications for similar assistance by dozens if not hundreds of religious organizations. Many less orthodox religious sects would be equally entitled to public funds from these programs, assuming they meet state law standards. Many of them may also act as a result of religious zeal and economic need with much less responsibility than the District Judge and this court have assumed was true concerning these defendants. Extensive monitoring would be required to maintain even a surface appearance of separation of church and state.
 
 
 159
 Still another aspect of the basic Lemon v. Kurtzman tests is Lemons' emphasis upon political divisiveness:
 
 
 160
 A broader base of entanglement of yet a different character is presented by the divisive political potential of these state programs. In a community where such a large number of pupils are served by church-related schools, it can be assumed that state assistance will entail considerable political activity. Partisans of parochial schools, understandably concerned with rising costs and sincerely dedicated to both the religious and secular educational missions of their schools, will inevitably champion this cause and promote political action to achieve their goals. Those who oppose state aid, whether for constitutional, religious, or fiscal reasons, will inevitably respond and employ all of the usual political campaign techniques to prevail. Candidates will be forced to declare and voters to choose. It would be unrealistic to ignore the fact that many people confronted with issues of this kind will find their votes aligned with their faith.
 
 
 161
 Id. 403 U.S. at 622, 91 S.Ct. at 2115-2116.
 
 
 162
 As the Supreme Court notes immediately below, "political division along religious lines shows one of the principal evils against which the First Amendment was intended to protect." Lemon v. Kurtzman, supra at 622, 91 S.Ct. at 2116. Such political divisiveness has already been exemplified in a statewide voter referendum and extensive litigation. See illustrative citations on page two of this opinion; particularly In Re Proposal C (Traverse City School District v. Attorney General), 384 Mich. 390, 185 N.W.2d 9 (1971). Additionally, the District Judge has pointed to the fact that these programs were very much a part of a recent school board's campaign for increased millage and might well be again in 1983.
 
 
 163
 In the background of this litigation is a classic political battle over this same program referred to in the newspapers of 1971 as "parochiad." The issue was presented by a petition for a constitutional amendment, obviously intended to bar parochiad. Although the amendment was adopted, it was found invalid under the state constitution by the Michigan Supreme Court. See the dramatic story of this classic example of religious divisiveness as set forth in the Traverse City School case, supra, fn. 2.
 
 
 164
 The judgment of this District Court is affirmed.
 
 
 165
 KRUPANSKY, Circuit Judge, dissenting.
 
 I. ESTABLISHMENT OF RELIGION
 
 166
 Since the majority opinion conspicuously ignores the successful and fully documented operational history of the challenged Shared Time and Community Education programs, and relies upon speculation, conjecture and factually disproved hypotheses, I must respectfully dissent. The salient facts are undisputed and uncomplicated. Grand Rapids, through legislative authorization, has during the six years preceding this action implemented Shared Time and Community Education programs whereby public school instructors teach supplemental secular courses at physical facilities owned by non-public schools in "public classrooms". These courses have been offered to non-public students at public facilities for over 60 years. The exhaustive record compiled in this case is compelling for what it has failed to develop. Although the two programs are offered at over 41 private schools, and involve as many as 470 full and part-time instructors and 11,000 students on an annual basis, no evidence of record supports the proposition that any teacher, even on a single instance either directly or indirectly, used or attempted to use the secular instructional period as a vehicle for sectarian indoctrination. The majority concedes, as it must, that "[t]here is no proof that any teacher in either Shared Time or Community Development classes has sought in such classes to indoctrinate any student in accordance with the school's religious persuasion." (Maj. op., supra, 1404) Although absolutely no evidence of indoctrination or attempted indoctrination exists, in spite of incalculable encounters between pupils and instructors during the six years of the programs' operation, the majority concludes that conducting the courses on premises owned by non-public schools is, in and of itself per se, advancing religion in violation of the First Amendment to the Constitution. This record demonstrates unequivocally, however, that the Shared Time and Community Education programs have remained in practice constitutionally neutral.
 
 
 167
 The documented operational history of the challenged Shared Time and Community Education programs places this action in a unique constitutional posture. Although the majority has elected to ignore the flawless operation of the challenged programs, it is a fundamental cannon of jurisprudence that adjudications must be predicated upon the record before the court. This elementary principle is fully applicable to challenges to state action as violative of the establishment clause. For example, the Supreme Court has refused to address the constitutionality of a program authorized by statute until such time as the program had been implemented and an operational record was available for consultation:
 
 
 168
 The task of deciding when the Establishment Clause is implicated in the context of parochial school aid has proved to be a delicate one for the Court. Usually it requires a careful evaluation of the facts of the particular case. See, e.g., Lemon v. Kurtzman, 403 U.S. , 603, 91 S.Ct. 2105 [2108], 29 L.Ed.2d 745 (1971), and Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971). It would be wholly inappropriate for use to attempt to render an opinion on the First Amendment issue when no specific plan is before us. A federal court does not sit to render a decision on hypothetical facts, and the Court of Appeals was correct in so concluding.
 
 
 169
 Wheeler v. Barrera, 417 U.S. 402, 426, 94 S.Ct. 2274, 2288, 41 L.Ed.2d 159 (1974). See also: National Coalition for Public Education and Religious Liberty v. Harris, 489 F.Supp. 1248 (S.D.N.Y.1980).
 
 
 170
 As an inescapable corollary to Wheeler, the federal court which is reviewing an establishment clause challenge to an existing program must examine the program's operation and practice to ascertain whether it is constitutionally offensive. See also: Meek v. Pittenger, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975) (record consulted to ascertain nature of the benefited institutions, percentage of schools sectarian oriented, and amount of monies appropriated); Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (extensive record); Roemer v. Board of Public Works of Maryland, 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976) (lengthy record compiled during several weeks of trial primarily documenting the nature of the benefited institutions and the manner in which the challenged program was implemented); Wolman v. Walter, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977) (record supplied through parties' stipulations as to the manner in which a statutorily authorized program would be implemented); Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) (statute authorizing loan of secular texts to non-public students held constitutional in the absence of record establishing that texts were utilized as a vehicle for inculcation); Hunt v. McNair, 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973) (statute authorizing revenue bonds to assist institutions for higher education held constitutional in the absence of evidence that monies would be used to advance religious ideologies). Accordingly, it is incumbent upon this court to scrupulously confine its establishment clause analysis to the particular factual contours before it.
 
 
 171
 The tripartite test for identifying an impermissible state establishment of religion was pronounced in Lemon v. Kurtzman, 403 U.S. 602, 613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971):
 
 
 172
 First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, Board of Education v. Allen, 392 U.S. 236, 243, 88 S.Ct. 1923, 1926, 20 L.Ed.2d 1060 (1968); finally, the statute must not foster "an excessive government entanglement with religion." Waltz, supra, 397 U.S. at 674, 90 S.Ct. at 1414.
 
 
 173
 See also: Committee for Public Education & Religious Liberty v. Nyquist, 413 U.S. 756, 773, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973); Roemer v. Board of Public Works of Maryland, 426 U.S. 736, 748, 96 S.Ct. 2337, 2345, 49 L.Ed.2d 179 (1976); Wolman v. Walter, 433 U.S. 229, 236, 97 S.Ct. 2593, 2599, 53 L.Ed.2d 714 (1977); Larkin v. Grendel's Den, Inc., --- U.S. ----, ----, 103 S.Ct. 505, 510, 74 L.Ed.2d 297 (1983); Mueller v. Allen, --- U.S. ----, ----, 103 S.Ct. 3062, 3066, 77 L.Ed.2d 721 (1983).
 
 A. SECULAR PURPOSE
 
 174
 The district court determined, and the majority concedes, that the challenged programs are attended by a secular purpose and that the first criterion of Lemon has been satisfied.
 
 B. PRIMARY EFFECT
 
 175
 Confronting the inquiry of whether the Shared Time and Community Education programs have an impermissible primary effect of advancing religion, it is initially observed that the schools involved are sufficiently sectarian so as to invoke establishment clause analysis. The record reflects, and the majority observes, that a substantial portion of the functions of the institutions concerned are subsumed in the religious mission. The majority's finding of impermissible advancement of religion appears to be divisible into three categories: (1) recipients of the program are designated on a basis of religion; (2) the program directly benefits not only the school students but also the non-public institutions by conferring substantial financial benefits to the non-public schools and by maintaining an environment of religious autonomy; and (3) risk that religious doctrines would be advanced by instructors.
 
 
 176
 The majority predicates its conclusion that the programs at issue advanced religion upon the observation that "[t]he challenged programs impact upon a very narrow religious class of beneficiaries." (Maj. op., supra, 1398 - 1399). This statement is in direct contradiction to the majority's factual finding that "all Community Education programs are otherwise available at the public schools, usually as a part of their more extensive regular curriculum." (Maj. op., supra, 1393 - 1394). Simply, Grand Rapids has provided Community Education programs to both public and non-public school students. Although the only Community Education programs which are challenged in this action are those conducted on the premises of non-public schools, it is obvious that recipients of Community Education programs are not limited to pupils of the sectarian institutions. In this respect the Community Education programs are similar to the constitutionally permissible tax deductions, for tuition, textbooks and transportation available to parents with dependents attending public and private schools. Mueller v. Allen, --- U.S. ----, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983). It is further similar to the constitutionally firm statute authorizing free loans of textbooks to students attending both private and public schools approved in Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968). The majority's reliance upon Nyquist, supra, is therefore misplaced. In that case the constitutionally infirm statutes established three financial aid programs available only to non-public elementary and secondary schools. Simply, in the case at bar, the class of beneficiaries, unlike that in Nyquist, is not so limited.
 
 
 177
 The majority further predicates a finding of advancement of religion upon the premise that the challenged programs conferred a financial benefit upon the non-public schools by relieving their fiscal responsibilities:
 
 
 178
 Another glaring nonsecular effect of the programs is that financial responsibility for teaching Physical Education, Art, Music and all of the other available course offerings has been transferred from the private religious schools to the taxpayers.
 
 
 179
 (Maj. op., supra, at 1399 - 1400) (emphasis added). The non-public schools, however, were never charged with a responsibility for offering the challenged courses. As the majority concedes,
 
 
 180
 The specific courses available through the elementary level Shared Time programs would not otherwise be available in any of the nonpublic schools, and are not required for graduation or progression to the next grade.
 
 
 181
 (Maj. op., supra, at 1392 - 1393).[1] All Shared Time programs, therefore, are supplemental to the statutorily required core curriculum which must be offered by the non-public schools as a condition of state accreditation. Similarly, all Community Education courses are supplemental. It follows logically that the non-public schools have not been relieved of a fiscal responsibility since they were never charged with a statutory duty to offer the supplemental courses at issue.
 
 
 182
 At best, the Community Education and Shared Time programs permit the non-public schools to offer an expanded supplemental curriculum at the facilities in issue. There is no evidence of record, however, that this expanded curriculum has resulted in an increase in the enrollment of the participating institutions. In fact, the percentage of school age children in Grand Rapids attending non-public schools has remained within 1 percentage point of 30% from 1971 (5 years prior to implementation of the Shared Time and Community Education programs in 1976) to 1981. The district court entered no finding nor is there support in the record that the non-public schools involved were economically distressed or that the challenged programs provided a economic lifeline to sectarian institutions. Rather, the record discloses that said institutions enjoyed and continue to enjoy economic self-sufficiency. In sum, there is no evidence that the sectarian institutions were relieved of fiscal responsibilities or depended upon the challenged programs for economic survival.
 
 
 183
 The majority also predicates a finding of advancement of religion upon the premise that the challenged programs benefited the schools, as institutions, by enabling them to offer supplemental secular courses while simultaneously avoiding student exposure to non-religious environments. Conspicuously absent from the majority opinion is any reference to Supreme Court precedent in support of the proposition that the maintenance of religious autonomy of the sectarian institutions involved may serve as a criterion for identifying an impermissible advancement of religion. Nor does such a novel legal proposition reflect the spirit of the Court's establishment clause cases. In Wheeler v. Barrera, 417 U.S. 402, 94 S.Ct. 2274, 41 L.Ed.2d 159 (1974) the Court refused to hold unconstitutional a federal statute which authorized federal monies for public schools and "comparable" programs in non-public schools. An obvious by-product of the Wheeler statute would be preservation of religious autonomy of sectarian schools receiving grants for "comparable" programs. Similarly, in Wolman v. Walter, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977) the state's constitutionally permissible provision of texts, standardized testing and scoring and diagnostic services at the sectarian schools served, ultimately, to promote religious autonomy. The preservation of a religious environment generated by the Shared Time and Community Education programs at issue is, at best, an "incidental" benefit to the non-public schools. Reflecting decades of precedent, the Supreme Court has recently reaffirmed the proposition that incidental benefits do not offend the first amendment:
 
 
 184
 One fixed principle in this field is our consistent rejection of the argument that "any program which in some manner aids an institution with a religious affiliation" violates the Establishment Clause.
 
 
 185
 Mueller v. Allen, --- U.S. ----, ----, 103 S.Ct. 3062, 3065, 77 L.Ed.2d 721 (1983). Accord: Lemon, supra, 91 S.Ct. at 2112; Nyquist, supra, 93 S.Ct. at 2965; Meek, supra, 95 S.Ct. at 1763; Roemer, supra, 96 S.Ct. at 2345.
 
 
 186
 Last, the majority predicates a finding of advancement of religion upon the programs' inherent potential to be utilized as a vehicle for indoctrination of religious ideologies:
 
 
 187
 Without questioning the good faith and integrity of the teachers, this Court cannot ignore the potential for advancing religious doctrine under these conditions. Notwithstanding these concerns, a larger problem lies in the fact that challenged courses are conducted in the sectarian atmosphere of the religious schools. As specifically addressed in Nyquist, there is a deeper concern that the atmosphere of the schools, rather than the actions of the instructors, will have an effect which advances religion.[2]
 
 
 188
 (Maj. op., supra, at 1398 - 1399.) Given the detailed and documented successful operational history of the Shared Time and Community Education programs, the majority's reliance upon an abstract "potential for advancing religious doctrine[s]" is totally inapposite. No evidence of record supports a finding that any teacher ever advanced religious views during the 6-year period at issue. Rather, the record is replete with myriad affidavits and testimony of program instructors attesting to the contrary. The evidence of record, in its entirety, supports the conclusion that all instructors scrupulously confined their instruction to the secular.
 
 
 189
 The district court, and the majority, err as a matter of law by interjecting hypothesis into the constitutional "primary effect" inquiry and by ignoring the documented historical display of neutralism which attended the programs' operations. At least one court has sought to defer to documentary evidence when such exists:
 
 
 190
 The Court will not conjure up hypothetical situations in the face of a fourteen year record. See Wheeler v. Barrera, supra, 417 U.S. at 426-27, 94 S.Ct. at 2287-88. On the basis of all the evidence presented, the Court concludes that the risk of religious advancement has not been realized and New York City's Title I program does not have an unconstitutional primary effect.
 
 
 191
 National Coalition for Public Education and Religious Liberty v. Harris, 489 F.Supp. 1248, 1265 (S.D.N.Y.1980), app. dism., 449 U.S. 808, 101 S.Ct. 55, 66 L.Ed.2d 11 (1980), reh. den., 449 U.S. 1028, 101 S.Ct. 601, 66 L.Ed.2d 491 (1980). The risk or danger that an instructor may potentially advance religious views is more properly directed to the issue of whether such instructors require monitoring to insure that no religious views are advanced, which in turn joins the issue as to whether such monitoring would generate impermissible entanglement of church and state. However, when confronted with the second Lemon inquiry, namely, whether the challenged program has the primary effect of advancing religion, the record may not be abdicated in favor of hypothetical speculation. There is no proof that any teacher advanced religious ideologies during the secular activities. All proof is to the contrary. Therefore, the second prong of Lemon has been satisfied.
 
 
 192
 The Shared Time and Community Education programs are prime examples of the "student benefit programs" which have been repeatedly countenanced by the Supreme Court as constitutionally inoffensive. See: Everson v. Board of Education, supra; Board of Education v. Allen, supra; Committee for Public Education and Religious Liberty v. Regan, 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980); Mueller v. Allen, supra. The students' exposure to supplemental secular instruction renders the pupils, rather than the institutions, the principal beneficiaries of the challenged programs. The Court's decisions in Allen, Meek and Wolman clearly teach that the state may provide secular written texts to pupils attending sectarian schools without violating the establishment clause. A logical corollary to these cases is the principle that the state may provide oral secular instruction so long as such instruction is, in fact and practice, confined to secular ideologies and does not have the primary effect of advancing religion. In the action sub judice the students have received secular instruction which is no more constitutionally offensive than the "instruction" which appears in the published forms of textbooks.
 
 C. ENTANGLEMENT
 
 193
 State action which fosters "an excessive government entanglement with religion" violates the establishment clause. Lemon, supra, 403 U.S. at 613, 91 S.Ct. at 2111 (emphasis added). This test, by its own terms, instructs that some entanglement between church and state is constitutionally permissible. See: Hunt v. McNair, 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973) (state inspection of private facilities to insure that revenue bond funds were utilized for secular projects did not excessively entangle church and state); Van Mueller v. Allen, supra (state's inspection of tax return to assure that deductions were not taken for religious textbooks not "excessive"). The administrative relationship which exists between the church and state in the implementation and logistic scheduling process of the Shared Time and Community Education programs is minimal.
 
 
 194
 The majority predicates a finding of impermissible entanglement upon the theory that the Shared Time and Community Education programs created a potential for the advancement of religious ideologies generating a need to monitor the instructors to insure neutrality. However, since the record unequivocally discloses the complete absence of any religious indoctrination or attempted religious indoctrination during the protracted implementation of the programs at issue irrespective of any monitoring by the state, the majority's position is equivalent to a per se rule against secular instruction at sectarian owned facilities because of a factually disapproved speculation that a need to monitor this relationship will, without exception, constitute excessive entanglement. Such a per se rule is totally incongruent with the flexible nature of the establishment clause. The "entanglement" test initially pronounced in Lemon, supra, presupposes the existence of a potential for the advancement of religious ideologies. It has typically been utilized where there is no record as to the presence or absence of religious advancement during the course of the challenged program's administration; in such instances the court simply identifies the entanglement which would be necessary to assure that the potential for advancement is not realized. See, e.g., Nyquist, supra.
 
 
 195
 The "primary effect" and "entanglement" criteria of Lemon are therefore related inquiries. Logic dictates that as the "potential" for advancement of religion decreases the need to monitor correspondingly decreases. It is axiomatic that the state's need to monitor will decrease when the likelihood that religion will indeed be advanced is highly improbable.
 
 
 196
 In the action sub judice no instructor during the 6-year period at issue has ever utilized or attempted to utilize the Shared Time and Community Education programs as a vehicle for religious indoctrination. There is no reason to believe that continued implementation of these challenged programs will deviate from this firmly established practice in the future. At this point in the history of the programs' operations, and in light of the exhaustive record, it is beyond peradventure that there never was a necessity to monitor the program in the past and accordingly every reason to believe that the need will not arise in the future. Without such monitoring or need to monitor, no "entanglement" manifests. The foregoing rationale applies with equal force to the issue of "political entanglement". There is no evidence of record to support the proposition that any political divisiveness has resulted in response to the Shared Time and Community Education programs.
 
 
 197
 In the event that any instructor in the future transgresses the constitutional boundaries of neutralism and advances religious ideologies, the federal forum is forever available to timely foreclose such activity. However, upon the flawless record before this Court, it simply cannot be concluded that the Shared Time and Community Education programs are unconstitutional.II. STANDING
 
 
 198
 Further, the individual plaintiffs lack standing to initiate this action and it should be dismissed for lack of Article III jurisdiction. In 1968 the Supreme Court issued Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), wherein it distinguished its earlier pronouncements in Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), and conferred standing upon taxpayers to invoke federal jurisdiction upon satisfying certain defined criteria. In Flast, it was observed that Congress had enacted the Elementary and Secondary Education Act of 1965 (Act) pursuant to the authority of Article I, Sec. 8, United States Constitution, which authorizes Congress to appropriate and expend allocated sums for the general welfare. The Act authorized appropriations of federal funds to state educational agencies for distribution to local educational institutions which had submitted education programs designed to aid low income families. Before a local educational agency could receive such funding, however, it was required to submit a "plan" to the state educational agency satisfying various criteria promulgated by the United States Commissioner of Education, the individual responsible for implementation of the act. One salient criterion necessitated the plan to equally benefit low income students attending both public and private institutions. As a result, federal funds were channeled to provide instructors and textbooks in religious schools. A taxpayers' action was initiated seeking (1) a declaration that either the Act did not approve expenditures to religious schools or, if so, the Act was unconstitutional to the extent as violative of the establishment clause and (2) an injunction prohibiting such expenditures.
 
 
 199
 Flast established a two-pronged test, as noted by the district court, for taxpayer standing:
 
 
 200
 Thus, our point of reference in this case is the standing of individuals who assert only the status of federal taxpayers and who challenge the constitutionality of a federal spending program. Whether such individuals have standing to maintain that form of action turns on whether they can demonstrate the necessary stake as taxpayers in the outcome of the litigation to satisfy Article III requirements.
 
 
 201
 The nexus demanded of federal taxpayers has two aspects to it. First, the taxpayer must establish a logical link between that status and the type of legislative enactment attacked. Thus, a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, Sec. 8, of the Constitution. It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute. This requirement is consistent with the limitation imposed upon state-taxpayer standing in federal courts in Doremus v. Board of Education, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952). Secondly, the taxpayer must establish a nexus between that status and the precise nature of constitutional infringement alleged. Under this requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, Sec. 8. When both nexuses are established, the litigant will have shown a taxpayer's stake in the outcome of the controversy and will be a proper and appropriate party to invoke a federal court's jurisdiction.
 
 
 202
 Id., 392 U.S. at 102-03, 88 S.Ct. at 1953-54.
 
 
 203
 Flast expressly adjudged that the establishment clause constituted a specific limit on the taxing and spending power:
 
 
 204
 We have noted that the Establishment Clause of the First Amendment does specifically limit the taxing and spending power conferred by Art. I, Sec. 8. Whether the Constitution contains other specific limitations can be determined only in the context of future cases.
 
 
 205
 Id., 392 U.S. at 105, 88 S.Ct. at 1955.
 
 
 206
 Accordingly, Flast acknowledged taxpayer standing to the extent that it permitted the taxpayer to challenge the constitutionality of an exercise of congressional power emanating from the taxing and spending clause of Art. I, Sec. 8 of the United States Constitution. This criteria was satisfied in Flast since the taxpayer sought a declaration that the Elementary and Secondary Education Act of 1965 was unconstitutional in that it authorizes various expenditures to religious schools. Simply, the Flast taxpayer directly challenged the constitutionality of a congressional enactment. The Flast taxpayer would not have enjoyed standing had the complaint alleged only "an incidental expenditure of tax funds in the administration of an essentially regulatory statute." Flast, supra, 392 U.S. at 102, 88 S.Ct. at 1953.
 
 
 207
 In its most recent taxpayer standing decision the Supreme Court reaffirmed the Flast requirement that the challenge issue to a congressional action. Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Therein it was observed that Article IV, Sec. 3, Cl. 2 of the United States Constitution (property clause) vests Congress with the power to dispose of property owned by the United States. Consistent with this delegation of power, Congress enacted the Federal Property and Administrative Services Act of 1949. Said Act authorized the Secretary of HEW to dispose of surplus real property "for school, classroom, or other educational use." The Secretary of HEW promulgated a regulation providing that the price of surplus property sold for a "public benefit" would be discounted to the extent that the United States shared in the benefits of the new use. In accordance with the foregoing authorization, the Secretary conveyed a 77 acre tract of land which had been declared "surplus property" to the Valley Forge Christian College. The entire appraised value of the property at the time of conveyance, $577,500, was discounted and Valley Forge acquired the property without financial payment. The deed from HEW required Valley Forge to use the property for 30 years for educational purposes consistent with Valley Forge's application. By its own description, Valley Forge's purpose was to offer collegiate level training to men and women for Christian service as either ministers or laymen. Subsequent to the conveyance, Americans United for Separation of Church and State (Americans United) initiated an action seeking (1) a declaration that the conveyance was void as violative of the Establishment Clause and (2) an order compelling Valley Forge to transfer the tract back to the United States. The Supreme Court adjudged that Americans United, and the individual members thereof, lacked standing as taxpayers to initiate the cause of action because: (1) the complaint did not challenge legislative action, but rather an executive decision by HEW, and (2) the legislative act upon which the HEW decision was predicated emanated from the property clause of the United States Constitution rather than from the taxing and spending clause (Art. 1, Sec. 8):
 
 
 208
 Unlike the plaintiffs in Flast, respondents fail the first prong of the test for taxpayer standing. Their claim is deficient in two respects. First, the source of their complaint is not a congressional action, but a decision by HEW to transfer a parcel of federal property. Flast limited taxpayer standing to challenges directed "only [at] exercises of congressional power." Id. at 102, 88 S.Ct., at 1954. See Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 228, 94 S.Ct. 2925, 2935, 41 L.Ed.2d 706 (1974) (denying standing because the taxpayer plaintiffs "did not challenge an enactment under Art. I, Sec. 8, but rather the action of the Executive Branch").
 
 
 209
 Second, and perhaps redundantly, the property transfer about which respondents complain was not an exercise of authority conferred by the taxing and spending clause of Art. I, Sec. 8. The authorizing legislation, the Federal Property and Administrative Services Act of 1949, was an evident exercise of Congress' power under the Property Clause, Art. IV, Sec. 3, cl. 2. Respondents do not dispute this conclusion, see Brief for Respondents 10, and it is decisive of any claim of taxpayer standing under the Flast precedent.
 
 
 210
 102 S.Ct. at 762-63 (footnotes omitted).
 
 
 211
 Collectively, Flast and Valley Forge make clear that taxpayer standing demands a challenge to the constitutionality of a congressional action, i.e., a legislative enactment. The Flast taxpayer challenged the constitutionality of the Elementary and Secondary Education Act of 1965. The Valley Forge taxpayers lacked standing because they did not contest the constitutionality of the underlying statute, but rather challenged an administrative decision rendered to implement the statute: "the source of their complaint [was] not a congressional action." 102 S.Ct. at 762.
 
 
 212
 Valley Forge firmly established that a federal taxpayer will possess standing as a taxpayer only where the challenged spending or fiscal appropriations derive from a legislative enactment promulgated in accordance with the taxing and spending clause of Art. 1, Sec. 8. By analogy, a state taxpayer, as in the case at bar, must challenge appropriations derived from the state's constitutional equivalent to Art. 1, Sec. 8 of the United States Constitution. The Michigan Constitution vests in the Michigan Legislature the power to appropriate public funds. The Michigan Legislature has enacted provisions whereby funds derived from liquor excise taxes are channelled to school aid funds, M.C.L.A. Sec. 388.1612 (Repealed by P.A. 1982, No. 462, Sec. 2, Eff. April 24, 1983), and general funds may be channelled to school and aid funds, M.C.L.A. Sec. 388.1611, when other funds are insufficient to meet fiscal demand. The Michigan Legislature has also enacted the State School Aid Act of 1979, M.C.L.A. Sec. 388.1601 et seq., which authorizes payment of state school aid funds to local boards of education for part time students receiving shared time instructions. Defendants, pursuant to this statute, and Administrative Rules Secs. 340.6 and 340.7, promulgated by the Michigan Department of Education, have authorized payment of school aid funds to local boards of education.
 
 
 213
 Had plaintiffs challenged the constitutionality of these Michigan legislative enactments, they may possibly have invoked taxpayer standing under the criteria of Flast and Valley Forge. Plaintiffs, however, have not challenged the constitutionality of any statutory provision. Rather, the complaint, at best, avers a vague nexus between the Shared Time and Community Education programs and the status of plaintiffs as taxpayers:
 
 
 214
 5. Each of the individual plaintiffs is a citizen of the United States and a resident within said school district and pays income taxes and other taxes to the United States, and to the State of Michigan and the said school district, and each is a qualified, legal voter registered in the city of Grand Rapids, Kent County, Michigan.
 
 
 215
 * * *
 
 
 216
 * * *
 
 WHEREFORE, plaintiffs pray:
 
 217
 (1) For a Judgment declaring the leasing and "shared time" arrangement between School District and the various nonpublic schools, and the payment of state aid funds to School District, to be violative of the Establishment Clause of the First Amendment to the United States Constitution, as made applicable to the states by the Fourteenth, and therefore illegal and null and void.
 
 
 218
 The pleading of such a vague nexus between the challenged programs and plaintiffs' status as taxpayers is insufficient under Flast and Valley Forge to invoke taxpayer standing. The instant taxpayers, as those in Valley Forge, have simply challenged executive decisions rather than exercises of congressional power. The complaint, as framed, fails to invoke Article III jurisdiction and the cause of action should have been dismissed for this reason.
 
 
 
 [1]
 Cf. Hunt v. McNair, 413 U.S. 734, 741, 93 S.Ct. 2868, 2873, 37 L.Ed.2d 923 (1973)
 
 
 [2]
 Cf. Mueller & Noyes v. Allen, --- U.S. ----, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983); Wolman v. Walter, 433 U.S. 229, 246-7, 97 S.Ct. 2593, 2604-2605, 53 L.Ed.2d 714 (1977); Hunt v. McNair, 413 U.S. 734, 743-44, 93 S.Ct. 2868, 2874-2875, 37 L.Ed.2d 923 (1973); Zorach v. Clauson, 343 U.S. 306, 308-9, 72 S.Ct. 679, 681-682, 96 L.Ed. 954 (1952); Everson v. Bd. of Education, 330 U.S. 1, 17, 67 S.Ct. 504, 512, 91 L.Ed. 711 (1947)
 
 
 [3]
 Roemer v. Maryland Public Works Bd., 426 U.S. 736, 755-59, 96 S.Ct. 2337, 2349-2351, 49 L.Ed.2d 179 (1976); Cf. Hunt v. McNair, 413 U.S. 734, 743-44, 93 S.Ct. 2868, 2874-2875, 37 L.Ed.2d 923 (1973)
 
 
 [4]
 Cf. Mueller & Noyes v. Allen, --- U.S. ----, ----, 103 S.Ct. 3062, 3068, 77 L.Ed.2d 721 (1983); Hunt v. McNair, 413 U.S. 734, 745 n. 7, 93 S.Ct. 2868, 2875 n. 7, 37 L.Ed.2d 923 (1973)
 
 
 [1]
 The majority herein, citing the district court opinion, continues as follows:
 "The participating private secondary schools, however, require for graduation a course in physical education. Such courses are offered at those schools only on a Shared Time basis."
 This statement is misleading since appellants have not appealed from the district court's judgment to the extent that it prohibits physical education and industrial arts Shared Time classes at the secondary level.
 
 
 [2]
 The majority concedes that the space occupied and used for implementation of the Shared Time Community Education programs have at all times here in issue been completely desanctified and totally devoid of any religious icons or symbols